UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PARAFLON INVESTMENTS, LTD.,

                              Plaintiffs,

                 - against –

FULLBRIDGE, INC., PETER OLSON, CANDICE OLSON,
EDWARD J. MATHIAS, DAVID WONG and MICHAEL
MOE,

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.

**COMPLAINT**

        Paraflon Investments, Ltd. ("Paraflon" or "Plaintiff") brings this complaint against defendants Fullbridge, Inc., ("Fullbridge" or the "Company"), Peter Olson, Candice Olson, Edward J. Mathias, David Wong and Michael Moe (the "Individual Defendants") (collectively with Fullbridge, the "Defendants") for securities fraud, breach of contract and other relief.

## NATURE OF THE ACTION

        1.      This is a federal securities action by Paraflon seeking to recover compensable damages caused by Defendants' violations of federal securities laws pursuant to remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Additionally, Paraflon has also brought suit for breach of contract and other common law claims.

        2.      Founded by the Olsons in 2011, Fullbridge touts itself as a revolutionary advanced education degree program with thousands of participants around the globe.  In 2015, when Paraflon initially invested in Fullbridge, Defendants estimated that Fullbridge's revenues would skyrocket to nearly $100 million within three years.  Much of the Company's forecasted success hinged on $40 million in cash flow generated from a contract with the Saudi Arabian Labor Ministry.  Based on Defendants' representations and lofty projections, Paraflon invested

over $1 million in Fullbridge in 2015.  Paraflon invested in Fullbridge, in part, because the Company agreed to hold its investment in a designated escrow account until a respective funding round closed.  However, Fullbridge has admitted that, at least as to $750,000 of Paraflon's investment, such protections were not put in place, and its funds were plundered for Fullbridge's benefit.

3.     By January 2016, Fullbridge's misrepresentations started coming to light: the $40 million contract with the Saudi Labor Ministry never materialized, the Company was being threatened with a lawsuit by another investor, all funds raised to date had been mismanaged and spent, and the Company was facing imminent bankruptcy.  The Company intentionally hid this information from Paraflon in order to induce investment.  The Individual Defendants failed completely to oversee and govern the Company, and contributed to Fullbridge's squandering of Paraflon's investment.  Paraflon believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PARTIES

4.     Paraflon is a private limited company, with a principal place of business in the British Virgin Islands.  Paraflon was a major investor in Fullbridge, investing $1,250,000 in Fullbridge in 2015.

5.      Defendant Fullbridge is a Delaware corporation with its principal place of business in Boston, MA.

6.     At all times relevant hereto, Defendant Edward J. Mathias was a Director of Fullbridge.

7.     At all times relevant hereto, Defendant David Wong was a Director of Fullbridge.

8.     At all times relevant hereto, Defendant Michael Moe was a Director of Fullbridge.

9.      At all times relevant hereto, Defendant Peter Olson was the Co-CEO of Fullbridge, as well as the Treasurer, Secretary, and a Director.

10.     At all times relevant hereto, Defendant Candice Olson was the Co-CEO of Fullbridge, as well as the President and a Director.

11.     Each of the Individual Defendants:

  a.  directly participated in the management of Fullbridge;

  b.  were directly involved in the day-to-day operations of Fullbridge at the highest levels;

  c.  were privy to confidential proprietary information concerning Fullbridge and its business and operations;

  d.  were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

  e.  were aware of or recklessly disregarded the fact that false and misleading statements were being communicated concerning Fullbridge; and

  f.  approved or ratified these statements in violation of the federal securities law.

12.     As officers, directors, and controlling persons of a company whose securities are registered with the SEC pursuant to the Exchange Act, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously issued statements that had become materially misleading or untrue.

13.     Fullbridge is liable for the acts of the Individual Defendants under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under respondeat superior and agency principles.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. § 78j (b) and 78t (a)), and Rule 10-b5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendants conduct business in this district and sell their products in this district.

18.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

19.     Additionally, at all times relevant hereto, the rights and obligations of the parties related to any cause of action brought forth regarding to the securities being offered by Fullbridge were set forth in two Purchase Agreements between Fullbridge and Paraflon dated May 7, 2015 and November 20, 2015.

20.     Pursuant to both Agreements, the parties agreed, "…that any legal suit, action or proceeding arising out of or relating to this Agreement or the other Transaction Documents shall be instituted exclusively in the New York State Supreme Court, County of New York, or in the United States District Court for the Southern District of New York…"

## FACTUAL BACKGROUND

21.     Fullbridge is an company based in Boston, Massachusetts, and is a developer of

the "Fullbridge Program," an educational curriculum that aims to address the skills gap between

students and young professionals.

22.     Peter and Candice Olson founded Fullbridge in 2011.

23.     According to the Company's website, Peter Olson is the former Chairman and

CEO of Random House, as well as a former lecturer at Harvard Business School; Candice Olson

founded and was the CEO of iVillage.

24.     Per its website, the Company boasts that today, "Fullbridge is a global entity,

helping universities, businesses and government ministries close their workplace skills

gap…we're currently breaking down cultural barriers in Saudi Arabia by preparing a new

generation of young women for vocational opportunities…Plus, we're implementing our

renowned four-week Business Fundamentals Program at Prince Sultan University."

25.     As it relates to the services available to governments and foreign ministries,

Fullbridge states on its website that, "Countries need to ensure that their young people are

immediately employable in the global economy– even though the process of reforming

traditional educational pathways takes decades.  We are the proven international leader in

accelerating employability in young adults and early career employees who need up-skilling.  A

typical Fullbridge engagement reaches 10,000 students or more at one time, working through

large college and vocational school systems or other large initiatives, often on behalf of

ministries of education and labor.  Our work encompasses both direct student programs and

long-term capacity-building in coaches, blended learning, mobile, and LMS systems.  Everything

we do is focused on the hard skills, soft skills and traits that optimize employability."

26.     Fullbridge also claims that it is continuing to expand its impact globally in the Middle East, North Africa, Asia, Africa, Europe, and Latin America.

**Paraflon's Initial Investment in Fullbridge**

27.     On or around May 7, 2015, Fullbridge approached Paraflon about investing in the Company.

28.     At around this same time, Fullbridge provided to Paraflon, among other materials, a Confidential Private Placement Memorandum for Series D Convertible Preferred Stock; a Confidential Term Sheet; the Series D Preferred Stock Purchase Agreement; an Accredited Investor Questionnaire and Form W-9; a listing of Risk Factors for the Company; the Sixth Amended and Restated Certificate of Incorporation; the Fourth Amended and Restated Investors' Rights Agreement; the Fourth Amended and Restated Voting Rights Agreement; and the Company's By-Laws.

29.     Fullbridge also provided its financial information to Paraflon, including but not limited to, unaudited financial statements, financing history and capitalization tables.

30.     Additionally, Fullbridge provided to Paraflon an investor presentation containing additional representations regarding the financial health of the Company.

31.     Encouraged by the representations made by Fullbridge concerning the Company's revenues and prospects for growth, Paraflon purchased $500,000 worth of Round D preferred shares from Fullbridge in May 2015.

**Fullbridge Induces Paraflon to Invest Additional Funds in the Company**

32.     In November 2015 Fullbridge, by and through Christopher Davies, approached Paraflon about purchasing Round D-1 preferred shares of the Company.

33.     In an effort to convince Paraflon to invest additional funds in the Company,

Fullbridge provided Paraflon with an investor presentation containing representations regarding its financial health.

34.     On information and belief, the Individual Defendants had knowledge of, approved, and had the ultimate authority over, the contents and representations in the investor presentation.

35.     On information and belief, all of the Individual Defendants knowingly and willingly signed and gave consent for the offering of D-1 round shares.

36.     Credit Suisse drafted the investor presentation on Fullbridge's behalf.

37.     In the October 2015 investor presentation, Fullbridge represented that in 2015 it was awarded a three year contract with the Saudi Labor Ministry worth $40,000,000 in future cash flow to the Company.

38.     Under the heading, "Recent Developments (May – mid October 2015)," the presentation stated that Fullbridge maintained, "Large, stable revenue (repeat business)- $40MM share of Wave 3 of 21st century and vocational skill programs (Saudi Labor Ministry)."

39.     Upon information and belief, the alleged contract with the Saudi Labor Ministry never existed.

40.     Upon information and belief, at the time Fullbridge provided the investor presentation to Paraflon, Fullbridge, including but not limited to the Individual Defendants, knew that the Saudi Labor Ministry transaction either failed or never existed, and intentionally withheld this information from Paraflon.

41.     Additionally, and as set forth more fully below, in 2016 Paraflon learned that the financial data Fullbridge provided in the October 2015 investor presentation, as well as other financial information disclosed to Paraflon, misrepresented the financial condition of the

Company.

42.     By way of background, in 2013, Mr. Olson, on behalf of Fullbridge, offered Tiverton Investments, Ltd. ("Tiverton") the opportunity to engage in a joint venture with Fullbridge.

43.     Specifically, Tiverton and Fullbridge would each own 50% of a new entity, Fullbridge MENA Holdings, LLC ("Fullbridge MENA").

44.     The financial information provided to Paraflon in connection with the D-1 round deceptively listed the revenue and profit of Fullbridge MENA as if it were wholly the profit and revenue of Fullbridge.

45.     Fullbridge MENA, however, is a separate legal entity, with separate corporate management and distinct revenues and profits than Fullbridge.

46.     The potential investors in the D-1 series, including Paraflon, were led to believe that Fullbridge MENA's revenues and profit were attributable to Fullbridge.

47.     Upon information and belief, the alleged contract with the Saudi Labor Ministry was a potential contract with Fullbridge MENA, *not* Fullbridge, Inc.

**Paraflon's November 2015 Investment**

48.     On November 20, 2015, in reliance on the information Fullbridge provided to Paraflon, including but not limited to, Fullbridge's representations concerning its financial viability and the purported existence of the contract with the Saudi Labor Ministry, Paraflon invested $750,000 in Fullbridge by purchasing 513,699 Round D-1 preferred shares (at a price of $1.46-$1.88 per preferred share).

49.     Fullbridge provided to Paraflon, among other materials, a Confidential Private Placement Memorandum for Series D-1 Convertible Preferred Stock; a Confidential Term Sheet;

the Series D-1 Preferred Stock Purchase Agreement; an Accredited Investor Questionnaire and Form W-9; a listing of Risk Factors for the Company; the Seventh Amended and Restated Certificate of Incorporation; the Fifth Amended and Restated Investors' Rights Agreement; the Fourth Amended and Restated Voting Rights Agreement; and the Company's By-Laws. Collectively these documents shall be referred to herein as the "Transaction Documents."

50.     Pursuant to the Transaction Documents, the D-1 shares were given priority over previous rounds of shares.

51.     The Transaction Documents also stated explicitly that, "Pending each closing, payments for Series D-1 Shares will be deposited in a segregated escrow account with Bridge Bank, as escrow agent.  Funds will be promptly refunded, without deduction or interest, if sales are not consummated or any subscriber is rejected."

52.     Section 2 of the Round D-1 Purchase Agreement, "Representations and Warranties of the Company," states in relevant part as follows:

> a.     Section 2.2, "Organization and Qualifications," states in part that the Company is not in violation or default of any of the provisions of its articles of incorporation, bylaws, or other organizational or charter documents;
>
> b.     Section 2.9, "Material Changes; Undisclosed Events, Liabilities or Developments," states in part that, "Except as set forth on Section 2.9 of the Schedule of Exceptions, since December 31, 2014: (i) there has been no event, occurrence or development that has had or that reasonably could be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP…"
>
> c.     Section 2.18, "Internal Accounting Controls," states that, "The Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit

preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

d.     Section 2.23, "Disclosure," states in relevant part that, "All of the disclosure contained in the Agreement and the Schedule of Exceptions regarding the Company and its Subsidiaries, their respective businesses, and the transactions contemplated hereby is true and correct in all material respects and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading."

e.     Section 2.24, "Solvency," states in relevant part that, "Based on the consolidated financial condition of the Company as of the Closing Date, after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder: (i) the fair saleable value of the Company's assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature, (ii) the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted, including its capital needs taking into account the particular capital requirements of the business conducted by the Company, and (iii) the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account the anticipated use of the cash, would be sufficient to pay all amounts on or in respect of its liabilities when such amounts are required to be paid…The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one (1) year from the Closing Date.  Schedule 2.24 of the Schedule of Exceptions sets forth as of the date hereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments…"

53.     Section 4, "Conditions of the Investors' Obligations at Closing," describes several

conditions precedent that must occur prior to Paraflon assuming any obligations to the Company.

a.     Section 4.1, "Representations and Warranties," affirms that the representations and warranties contained in Section 2 are true and accurate as of the Closing.

10

     b.     Section 4.2, "Performance," states that the Company shall have performed all "agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing."

     c.     Section 4.4, "Compliance Certificate," states that the Company shall provide "a certificate certifying that the conditions specified in Sections 4.1, 4.2 and 4.3 have been fulfilled."

     d.     Section 4.5, "Proceedings and Documents," states that all corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be satisfactory to Paraflon, and that "each Investor shall have received such counterpart original and certified or other copies of such documents as they may reasonably request."

     e.     Section 4.6, "Delivery of Securities," states that the Company shall delivery the Securities to Paraflon as specified in the agreement.

     f.     Finally, Section 4.7, "Delivery of Signature Page," states that the Company shall have executed and delivered the signature page to Investors.

54.     Section 7.1, "Knowledge," states that for the purposes of the Agreement, "to the knowledge of the Company," "to the Company's knowledge" and similar phrases mean, "the actual knowledge of the Company's officers; provided that each such Person will be deemed to have knowledge of a particular fact or matter if (i) such Person is actually aware of such fact or matter or (ii) a prudent individual in such Person's position would reasonably be expected to discover or otherwise become aware of such fact or matter in the course of performing his or her employment duties."

55.     Section 7.2, "Survival of Warranties," states that the representations and warranties contained in the Purchase Agreement shall survive for one (1) year.  Additionally, the provision states that, "The Investors are entitled to rely, and the parties hereto hereby acknowledge that the Investors have so relied, upon the truth, accuracy and completeness of each

of the representations and warranties of the Company contained herein, irrespective of any

independent investigation made by the Investors…"

56.     On information and belief, the Individual Defendants had knowledge of,

approved, and had the ultimate authority over, the contents and representations the Round D-1

Transaction Documents.

**Paraflon Discovers Fullbridge's Misrepresentations of Material Facts and Breaches
of the Transaction Documents**

57.     As set forth above, Fullbridge represented that Paraflon's funds would be placed

in an escrow account until the closing of the sale, and that the funds will be promptly refunded,

without deduction or interest, if the funding round did not close.

58.     Upon information and belief, Fullbridge did not place Paraflon's funds for the D-

1 Series round into an escrow account.

59.     Rather, upon information and belief, Fullbridge immediately spent Paraflon's

$750,000 investment, in violation of the terms of the Purchase Agreement.

60.     On information and belief, at the time Fullbridge spent Paraflon's funds, the D-1

round had not closed.

61.     Additionally, Fullbridge did not provide Paraflon with the requisite

documentation or share certificates prior to closing as required by Sections 1.2, 2.4, 4.5 and 4.6

of the November 20, 2015 Purchase Agreement.

62.     Moreover, Fullbridge did not provide Paraflon with a fully executed version of

the Purchase Agreement as required by Section 4.7 of the November 20, 2015 Purchase

Agreement.

63.     In 2016 Paraflon also began discovering that Fullbridge's representations and

warranties concerning its financial health were false.

64.    Between November 2015 and January 2016, while Fullbridge was touting the stability of the Company to Paraflon, Fullbridge was failing.

65.    By February 2016 – a bit more than 60 days after Fullbridge represented that it was a thriving company with bright future prospects – Fullbridge was experiencing serious financial difficulties.

66.    On information and belief, by this time Fullbridge was considering filing for bankruptcy protection.

67.    On February 13, 2016, GSV Capital – whose co-founder, Michael Moe, serves as a director of Fullbridge – recognized Fullbridge's cash flow problems.

68.    On information and belief, at around this time Fullbridge proposed allowing certain investors to loan Fullbridge funds, with a promise of a 3x return on that investment.

69.    This scheme ultimately raised approximately $4.4 million for the Company, while at the same time substantially diluting shareholder value.

70.    On information and belief, by March 2016, Fullbridge was struggling to pay its bills and was considering placing employees on unpaid furlough.

71.    In March 2016, Paraflon learned additional troubling information concerning its D-1 preferred shares: without Paraflon's prior consent, Fullbridge was downgrading its D-1 shares to Round D shares as a condition of the 3x bridge loan Fullbridge was seeking from its largest investor, GSV Capital.

72.    Given that it had no other options, in an effort to salvage value from its investment Paraflon agreed to "exchange" D-1 shares for Round D shares.

73.    In March 2016, Paraflon had no confirmation that the D-1 round had ever closed.

74.    At this time, Fullbridge also failed to communicate to Paraflon the full picture of

the financial state of the company.

75.     Specifically, Fullbridge still had not communicated that the purported contract with the Saudi Labor Ministry – which was with a separate entity, Fullbridge MENA – had fallen through; that there was active litigation with Fullbridge MENA; and that, contrary to Fullbridge's representations and warranties, the Company was not financially stable.

76.     These were material facts that Fullbridge purposefully and intentionally withheld from Paraflon to induce further investment in the Company.

77.     The Company's warranties and representations regarding its financial condition in Section 2 of the November 20, 2015 Purchase Agreement were clearly false and intentionally exaggerated in order to entice investment by Paraflon.

78.     These misrepresentations extended to the Company's portrayal of Fullbridge MENA.

79.     Upon information and belief, towards the end of 2015 and into January 2016 Tiverton became concerned regarding the handling of its investment in Fullbridge MENA.

80.     Specifically, on information and belief, Tiverton believed that Fullbridge was utilizing Fullbridge MENA's revenues to fund the Company, and that the funds of Fullbridge and Fullbridge MENA were not sufficiently segregated.

81.     Given these fears, on January 26, 2016, Tiverton, through its counsel, instructed Mr. Olson and Fullbridge to place Fullbridge MENA's funds in a segregated account.

82.     Fullbridge failed to act on Fullbridge MENA's request.

83.     On February 2, 2016, Tiverton's counsel sent a second letter demanding that Fullbridge segregate Fullbridge MENA's funds.

84.     Fullbridge also ignored this second request.

85.     Following this second request, Tiverton confirmed that the funds of Fullbridge and Fullbridge MENA had been comingled.

86.     As a result, on April 25, 2016, Tiverton on behalf of itself and suing in the right of Fullbridge MENA, filed a lawsuit against Fullbridge, Inc. and Peter Olson, Fullbridge MENA's Co-CEO.

87.     The complaint demonstrated that the dispute between Fullbridge, Tiverton and Fullbridge MENA surrounding Fullbridge's handling of Fullbridge MENA's revenues, had been ongoing since at least January of 2016.

88.     Upon information and belief, Fullbridge and the Individual Defendants knew of this dispute with Fullbridge MENA prior to, and during, their discussions with Paraflon concerning purchasing D-1 preferred shares.

89.     The dispute between Fullbridge and Fullbridge MENA was never disclosed to Paraflon.

90.     Paraflon was never informed by Fullbridge that Fullbridge MENA's revenue and profits were not entirely attributable to Fullbridge.

91.     Paraflon was never informed that the purported contract with the Saudi Labor Ministry was with Fullbridge MENA, rather than Fullbridge.

92.     Had Paraflon been made aware of these facts, it would not have invested in Fullbridge.

**The Failure of the D-1 Round**

93.     In March 2016, when Fullbridge first proposed the bridge loan to certain investors with a promised 3x return on that investment, Paraflon began investigating the fate of its $750,000 investment in the Company.

94.     In particular, Paraflon began questioning whether the D-1 financing round ever closed.

95.     By March 2016 Paraflon had never received any documents or communications from Fullbridge informing Paraflon that the D-1 round closed, and Fullbridge had failed to provide any share certificates or corporate documents evidencing the closing of the D-1 round.

96.     Upon information and belief, the D-1 round had not closed by April 2016.

97.     On April 12, 2016, during a phone call with new Fullbridge board member Matt Hanson of GSV Capital, Paraflon demanded the return of its $750,000 investment.

98.     Fullbridge confirmed on this call that that D-1 round never closed.

99.     On this same conference call, Fullbridge acknowledged for the first time that the Company had been dealing with serious financial and corporate governance problems for nearly a year.

100.    Following this call, on April 15, 2016, Eleni Kinani, on behalf of Titan Global, Ltd. (Paraflon's sole director), wrote to Fullbridge and requested that Fullbridge, "return within 7 business days the $750,000 sent on the basis of information and governance put forward by Fullbridge in November 2015, which turns out to be suspect leading to a failed round of fund raising and round D-1 failing.  No complete or executed package for D-1 was ever sent to Paraflon."

101.    Fullbridge never responded to Paraflon's correspondence.

102.    On April 26, 2016, Eleni Kinani sent a follow up letter to Fullbridge, again requesting that the Company refund Paraflon's investment as required by the Transaction Documents.

103.    Fullbridge failed to respond to Paraflon's correspondence, and did not refund

Paraflon's investment as required.

104.    At this time, due to the failure of Fullbridge to respond to Paraflon's inquiries, Paraflon was forced to retain counsel.

105.    On May 13, 2016, by and through counsel, Paraflon wrote to Fullbridge requesting the return of Paraflon's $750,000 investment.

106.    On May 19, 2016, by and through their counsel, Fullbridge responded by letter, stating that the D-1 Round closed on January 22, 2016; that Fullbridge stood by its warranties and representations contained in the Transaction Documents; that Fullbridge did not use Paraflon's funds improperly prior to the purported closing of the D-1 financing round; and, that Fullbridge would not be returning Paraflon's investment.

107.    The information contained in Fullbridge's counsel's correspondence is inconsistent with everything Fullbridge has told Paraflon to date.

108.    Upon information and belief, and contrary to assertions by Fullbridge's counsel, Fullbridge did not keep Paraflon funds in escrow as mandated by the Transaction Documents.

109.    In fact, on information and belief, Paraflon's funds were used improperly by the Company almost immediately.

110.    Along with its letter, Fullbridge's counsel sent documents purporting to show a signed purchase agreement and compliance certificate dated January 22, 2016.

111.    This was the first time that Fullbridge provided any documents to Paraflon allegedly demonstrating that the D-1 funding round closed.

112.    It was only after counsel was retained that Paraflon received a response, let alone documents from Fullbridge.

## COUNT I

### *Violations of Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5 Against All Defendants*

113.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

115.    Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Paraflon, including making various untrue statements of material fact, as well as omitting to state material facts.

116.    These material and untrue statements include but are not limited to:

      a.      Statements by Fullbridge in the investor presentation dated October 2015 where Fullbridge stated that in 2015 it was awarded a $40,000,000 three year contract with the Saudi Labor Ministry.  Within the same document, Fullbridge stated the Company had "large stable revenue" as a result of the alleged contract with the Saudi Labor Ministry.  Upon information and belief, the alleged contract with the Saudi Labor Ministry either never existed or never came to fruition.

      b.      Further, the alleged Saudi Labor Ministry contract was a contract with Fullbridge MENA, a separate entity, not Fullbridge.  Fullbridge failed to disclose this material fact to Paraflon, intentionally and knowingly misrepresenting that the transaction was with and for the sole benefit of Fullbridge.

c.   Within the same investor presentation, Fullbridge listed financial

projections, as well as the actual financial information for the company in

2013 and 2014.  As part of Fullbridge's revenue figures (both historical

and future) Fullbridge listed the revenue and profit of Fullbridge MENA

as if it were the profit and revenue of Fullbridge.

d.   Fullbridge MENA, however, is a separate legal entity, with separate

corporate management, and separate and distinct revenue and profits than

Fullbridge, Inc.

e.   The revenue and income generated by Fullbridge MENA was separate and

distinct from Fullbridge, and Fullbridge fraudulently represented that

Fullbridge MENA profits were solely that of Fullbridge in effort to

artificially inflate the revenue and profits of Fullbridge to entice

investment.   Fullbridge did not disclose this to Paraflon during the

investment process, nor is it noted in the investment documents for the D-

1 offering that Fullbridge is not entitled to all the revenue and profits

generated by Fullbridge MENA.

117.   Fullbridge and the Individual Defendants knew that the above statements and

representations were false.  Yet they did not inform Paraflon of the above as they intentionally

and knowingly sought to deceive Paraflon in order to induce Paraflon to invest in the Company.

118.   Paraflon relied on these erroneous representations and statements prior to, and

during, the D-1 round of fundraising.

119.   As a result of these misrepresentations, Paraflon invested an additional $750,000

in Fullbridge, an investment that Fullbridge has refused to return.

120.     By virtue of their positions at Fullbridge, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended to deceive Paraflon.

121.     In the alternative, the Defendants acted with reckless disregard for the truth by refusing to disclose those facts that demonstrated the suspect financial health and viability of the Company.

122.     Fullbridge and the Individual Defendants were aware that the Saudi Labor Ministry contract was never executed, and that the contract was contemplated as between Fullbridge MENA, not Fullbridge, Inc., and the Saudi Labor Ministry.

123.     The Defendants had a duty to inform Paraflon that its representations regarding the "long term stability" of the Company as a result of the Saudi Labor Ministry transaction were now false and incorrect.

124.     The Defendants knowingly and intentionally concealed this information so as to ensure that Paraflon did not request the return of its investment as it was permitted to do pursuant to the Purchase Agreement.

125.     The information showing that Fullbridge acted knowingly or with reckless regard for the truth is peculiarly within the Individual Defendants' knowledge and control.

126.     As the Co-CEOs of Fullbridge, Peter Olson and Candice Olson had knowledge of the details of Fullbridge's internal affairs.

127.     Additionally, Mr. Olson was the Co-CEO of Fullbridge MENA and, therefore, was aware of the distinction between that company and Fullbridge.

128.     Further, as Directors of Fullbridge, Edward Mathias, David Wong, and Michael Moe had knowledge of the details of Fullbridge's internal affairs.

129.    Given, their control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Fullbridge.

130.    As such, the concealment by the Individual Defendants, as well as Fullbridge, caused Paraflon to purchase securities in the Company.

131.    Had Paraflon not been misled by the Defendants, Paraflon would not have purchased or otherwise invested in Fullbridge.

132.    As a direct and proximate result of the Defendants' wrongful conduct, Paraflon suffered damages in connection with their investment in Fullbridge in an amount to be determined at trial.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

133.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134.    During the pertinent time period of this complaint, the Individual Defendants participated in the operation and management of Fullbridge, and conduced and participated, directly and indirectly, in the conduct of Fullbridge's business affairs.

135.    Due to their senior positions, the Individual Defendants knew that the adverse information concerning Fullbridge's operations, financial position, and future business prospects.

136.    Because of their positions of control and authority as Co-CEO's, Peter and Candice Olson were able to, and did, control the contents of the private placement memorandum, investor package, and transaction documents which were provided to Paraflon prior to, and during, the offer for D-1 preferred shares.

137.    Because of their positions of control and authority as Directors of Fullbridge,

Michael Moe, David Wong, and Edward Mathias were able to, and did, have ultimate authority and control over the contents of the private placement memorandum, investor package, and transaction documents which were provided to Paraflon prior to, and during, the offer for D-1 preferred shares.

138.    Each of the Individual Defendants, therefore, acted as a controlling person of Fullbridge within the meaning of Section 20(a) of the Exchange Act.

139.    By reason of their senior positions and being directors of Fullbridge, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Fullbridge to engage in the unlawful acts and conduct complained of herein.

140.    Each of the Individual Defendants exercised control over the general operations of Fullbridge and possessed the power to control the specific activities which compromise the primary violations about which Paraflon complains.

141.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Paraflon suffered damages in connection with their investment in Fullbridge in an amount to be determined at trial.

## **COUNT III**

### **Fraudulent Misrepresentation and Concealment As Against All Defendants**

142.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143.    Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Paraflon, including making various untrue statements of material fact, as well as omitting to state material facts.

144.    These material and untrue statements as discussed above, include but are not limited to:

     a.    Statements by Fullbridge in the investor presentation dated October 2015 where Fullbridge states that in 2015 it was awarded a $40,000,000 three year contract with the Saudi Labor Ministry.  Within the same document, Fullbridge stated the Company had "large stable revenue" as a result of the alleged contract with the Saudi Labor Ministry.  Upon information and belief, the alleged contract with the Saudi Labor Ministry either never existed, or never came to fruition.

     b.    Further, the Saudi Labor Ministry contract was a contract with Fullbridge MENA, not Fullbridge.  Fullbridge failed to disclose this material fact to Paraflon, intentionally and knowingly misrepresenting that the transaction was with and for the sole benefit of Fullbridge.

     c.    Within the same investor presentation provided to Paraflon in October 2015, Fullbridge listed financial projections, as well as the actual financial information for the company in 2013 and 2014.  As part of Fullbridge's revenue figures (both historical and future) Fullbridge listed the revenue and profit of Fullbridge MENA as if it were the profit and revenue of Fullbridge.

     d.    Fullbridge MENA, however, is a separate legal entity, with separate corporate management, and separate and distinct revenue and profits than Fullbridge, Inc.

     e.    The revenue and income generated by Fullbridge MENA was separate and

distinct from Fullbridge, and Fullbridge fraudulently represented that Fullbridge MENA profits were solely that of Fullbridge in effort to artificially inflate the revenue and profits of Fullbridge to entice investment.   Fullbridge did not disclose this to Paraflon during the investment process, nor is it noted in the investment documents for the D-1 offering that Fullbridge is not entitled to all the revenue and profits generated by Fullbridge MENA.

145.    Fullbridge, and the Individual Defendants, knew that the above statements and representations were false; yet, they did not inform Paraflon of the above as they intentionally and knowingly sought to deceive Paraflon into an investment.

146.    Paraflon relied on these erroneous representations and statements prior to, and during, the D-1 round of fundraising.

147.    As a result of these misrepresentations, Paraflon was induced to invest an additional $750,000 in Fullbridge, an investment that Fullbridge has refused to return.

148.    By virtue of their positions at Fullbridge, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended to deceive Paraflon, or in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose those facts that demonstrated the financial health and viability of the company.

149.    Moreover, Fullbridge and the Individual Defendants were aware that the Saudi Labor Ministry contract was never executed, and was contemplated as between Fullbridge MENA, not Fullbridge, Inc., and the Saudi Labor Ministry.

150.    As such, the Defendants had a duty to inform Paraflon that its representations

regarding the "long term stability" as a result of the Saudi Arabia were now false and incorrect.

151.   The Defendants knowingly and intentionally concealed this information so as to ensure that Paraflon did not pull its investment.

152.   The information showing that Fullbridge acted knowingly or with reckless regard for the truth is peculiarly within the Individual Defendants' knowledge and control.

153.   As the Co-CEOs of Fullbridge, the Olsons had knowledge of the details of Fullbridge's internal affairs.

154.   Because of their positions of control and authority as Directors of Fullbridge, Michael Moe, David Wong, and Edward Mathias had knowledge of the details of Fullbridge's internal affairs.

155.   Given, their control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Fullbridge.

156.   The concealment by the Defendants caused Paraflon to purchase securities from Fullbridge.

157.   Had the Defendants not misled Paraflon, Paraflon would not have purchased or otherwise invested in Fullbridge.

158.   As a direct and proximate result of the Defendants' wrongful conduct, Paraflon suffered damages in connection with their investment in Fullbridge in an amount to be determined at trial.

## COUNT IV

## Breach of Contract as Against all Defendants

159.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

160.    Fullbridge and Paraflon entered into a contract when they executed the Purchase Agreement in November 2015 to acquire D-1 preferred shares of Fullbridge.

161.    As set forth above, Fullbridge, under the direction and control of Peter Olson, Candice Olson, Michael Moe, David Wong, and Edward J. Mathias, breached several contractual obligations to Paraflon.

162.    The representations and warranties contained in Section 2 of the Purchase Agreement, including but not limited to those contained in Sections 2.2, 2.9, 2.18, 2.23 and 2.24, were either false when made or were breached within one year of the execution of the November 20, 2015 Purchase Agreement.

163.    Fullbridge did not perform and comply with all "agreements, obligations, and conditions contained [in the Purchase Agreement] that are required to be performed or complied with by it on or before the Closing."

164.    The "corporate and other proceedings" in connection with the Closing, as well as all documents incident thereto were inadequate, and Paraflon never received "all such counterpart[s] original and certified or other copies of such documents…" as required by the November 20, 2015 Purchase Agreement.

165.    The Company never delivered an executed signature page to the Series D-1 Preferred Stock Purchase Agreement as required by Section 4.7 of the November 20, 2015 Purchase Agreement.

166.    Lastly, Paraflon's funds were not placed in escrow pending the closing of the transaction, and were spent by Fullbridge prior to the purported closing date of January 22, 2016.

167.    Paraflon fully performed all of its obligations under the November 20, 2015 Purchase Agreement.

168.     All conditions precedent for Fullbridge's performance under the November 20, 2015 Purchase Agreement were satisfied.

169.     Fullbridge's conduct constitutes a breach of the November 20, 2015 Purchase Agreement and other transaction documents.

170.     As a result of the foregoing, Paraflon has suffered harm and damage in an amount to be determined at trial, including but not limited to the loss of their investment.

**COUNT V**

**Negligent Misrepresentation as Against All Defendants**

171.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172.     The Defendants and Paraflon had privity as a result of the sale and purchase of securities between Paraflon and Fullbridge.

173.     As such, defendants had a duty to communicate to Paraflon accurate information related to the offering of securities.

174.     As set forth above, Fullbridge, under the direction and control of Peter Olson, Candice Olson, Michael Moe, David Wong, and Edward J. Mathias, communicated false and material misrepresentations, as well material omissions, related to the purchase of securities by Paraflon.

175.     Paraflon relied on the false information provided by the defendants in investing in Fullbridge.

176.     As a result of the misrepresentations of the Defendants, Paraflon has suffered harm and damage in an amount to be determined at trial, including but not limited to, the loss of their investment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A.       Awarding Plaintiff compensatory damages in an amount to be determined at trial

as a result of the acts and transactions alleged herein;

B.       Award Plaintiff prejudgment and post-judgment interest, as well as reasonable

attorneys' fees, expert fees, and other costs;

C.       Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  New York, New York
        July 18, 2016

                              s/Andrew C. Levitt_____
                              Robert O'Hare, Jr.
                              Andrew C. Levitt
                              O'HARE PARNAGIAN LLP
                              82 Wall Street, Suite 300
                              New York, NY 10005
                              (212) 425-1401
                              rohare@ohareparnagian.com
                              alevitt@ohareparnagian.com

                                     and

                              Timothy J. Fazio
                              Michael R. Perry (pro hac vice motion pending)
                              Howard P. Goldberg (pro hac vice motion pending)
                              Jacob J. Struck (pro hac vice motion pending)
                              MANION GAYNOR & MANNING LLP
                              125 High Street
                              Boston, MA 02110
                              (617) 670-8800
                              rfazio@mgmlaw.com
                              mperry@mgmlaw.com
                              hgoldberg@mgmlaw.com
                              jstruck@mgmlaw.com